1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

BIOPURE HEALING PRODUCTS, LLC,

9

                              Plaintiff,

          v.

10

WELLNX LIFE SCIENCES, INC. and
PLATINUM US DISTRIBUTION, INC.
d/b/a WELLNX LIFE SCIENCES, USA,

11

12

                              Defendants.

13

CASE NO. C17-470

REPORT AND RECOMMENDATION

14

I.      INTRODUCTION AND SUMMARY CONCLUSION

15

This matter comes before the Court upon the motion of plaintiff BioPure Healing

16

Products, LLC ("BioPure") for a preliminary injunction against defendants WellNX Life

17

Sciences, Inc. and Platinum US Distribution, Inc. d/b/a WellNX Life Sciences, USA

18

(collectively "defendants" or "WellNX").  Dkt. 20 (redacted motion); Dkt. 23 (sealed motion).

19

On May 24, 2017, the Honorable Robert S. Lasnik referred this case to the undersigned for all

20

proceedings through the preparation and submission of a pretrial order.  Dkt. 31.  The Court,

21

having carefully considered the parties' submissions and arguments at the June 30, 2017 hearing,

22

hereby recommends that the Court GRANT BioPure's motion for a preliminary injunction.

23

1    Because this Report and Recommendation "grant[s] or den[ies] an interlocutory

2  injunction," findings of fact and conclusions of law are required. Fed. R. Civ. P. 52(a)(2).  The

3  Court's findings and conclusions are included in this Report and Recommendation, which serves

4  as a memorandum of the Court's decision. Fed. R. Civ. P. 52(a)(1) (permitting findings and

5  conclusions to be contained within "an opinion or a memorandum of decision filed by the

6  court"); *see also F.T.C. v. H.N. Singer, Inc.,* 668 F.2d 1107, 1109 (9th Cir. 1982) (noting that

7  explicit factual findings are unnecessary).

8                                    II.       BACKGROUND

9      A.  BioPure Healing Products, LLC and its BIOPURE Marks

10    BioPure is a manufacturer of natural nutritional supplement products, which it distributes

11  online and through a professional network of more than 1,700 health care practitioners

12  nationally.  Dkt. 22 (Annicchiarico Decl.) at ¶ 4.  BioPure was founded in 2005, and is

13  headquartered in Redmond, Washington.  *Id.*[1]

14    BioPure's health-related products come in a variety of forms including capsules, tablets,

15  liquid extracts, powders, and suppositories.  *Id.* at ¶ 18.  A major focus of BioPure's product line

16  is herbal extracts or tinctures, including Rosemary, Cilantro, Red Root, Stephania, and Cistus.

17  *Id.* at ¶ 22.  In addition to herbal extracts, BioPure sells loose herbal tea for brewing at home.  *Id.*

18  at ¶ 23.  Specifically, BioPure has been selling herbal tea, such as its Cistus herbal tea, under the

19  BIOPURE mark since 2010, and also sells products that are designed to be brewed into coffee or

20  tea.  *Id.* at ¶¶ 23, 37.  Some of these products are advertised as having superior antioxidant

21

22
_____

23        [1] BioPure's CEO, Joseph Annicchiarico, represents that BioPure's core tenets include a
commitment to the quality and purity of BioPure's raw ingredients, as well as safe, ethical, and
responsible extraction and manufacturing processes, continuous product testing, and
environmentally friendly bottling and packaging materials. *Id.* at ¶ 8.

properties to those of green tea (such as PC Ecklonia Cava) and other supplement products sold

by BioPure include green coffee extract and horsetail (an herb often used for tea) as ingredients.

*Id.* However, BioPure does not sell green tea or any products featuring green tea, or any weight-

loss supplements. Dkt. 41 (Johnson Decl.) at ¶¶ 25-33.[2]

BioPure's herbal tea, herbal extracts, tinctures, and related products are labeled with the

BIOPURE mark, and many sell for less than $40. Dkt. 22 (Annicchiarico Decl.) at ¶ 24.

Consumers often use BioPure's products as part of doctor-prescribed programs or regiments. *Id.*

at ¶ 18. BioPure sells its products primarily based on the recommendation of healthcare

practitioners through two channels: (1) direct online distribution to consumers from its website

and (2) wholesale distribution to healthcare professionals who resell the products to their clients.

*Id.* at ¶ 30.[3] All of BioPure's products are marketed and sold through the company's website,

www.biopureus.com. *Id.* at ¶ 31. Direct online sales make up more than 20% of BioPure's

sales. *Id.* In addition, a network of over 1,700 healthcare professionals market and advertise

BioPure products to consumers or resell BioPure products to their clients. *Id.* at ¶ 32.[4]

BioPure uses the name "BioPure" as a trademark on the labels and packaging of all of its

products, as well as in its advertising and promotional materials. *Id.* BioPure also uses the

BIOPURE mark in standard characters and in a stylized logo format that includes a capital "B"

---

[2] Herbal tea is not made from the leaves of the tea bush, Camelia Sinesis, but refers to any non-caffeinated infusion comprised of herbs, flowers, fruits and other plant materials. Dkt. 41 (Johnson Decl.) at ¶¶ 25-26. By contrast, green tea comes from the leaves of the tea bush. *Id.* at ¶ 25.

[3] BioPure distributes its products to healthcare professionals in 49 states and directly to consumers in all 50 states, including Puerto Rico and Guam. *Id.* at ¶ 30.

[4] For healthcare professionals without an in-house dispensary, the BioPure website serves as an important source of BioPure products.

1    and a capital "P." *Id.* at ¶ 19.  BioPure has attempted to register a variety of BioPure marks with

2    the U.S. Patent and Trademark Office ("USPTO") since 2010, with varying degrees of success.[5]

3          In April 2012, BioPure filed an application with the USPTO to register the stylized

4    version of the BIOPURE mark, which appears with a wave pattern directly underneath the word

5    "BioPure," for goods including "dietary supplements; food supplements; herbal supplements;

6    mineral supplements; natural herbal supplements, [and] nutritional supplements." Dkt. 42, Ex. E.

7    An Examiner's Amendment was issued in August 2012 to amend the identification of goods in

8    Class 5 to remove all the supplements, leaving only "(Based on Use in Commerce) electrolytes;

9    nutritionally fortified water; (Based on Intent to Use) suppositories."  Dkt. 42 (Drangel Decl.) at

10   ¶ 12; Dkt. 42, Ex. F.  Despite this amendment, Metagenics, Inc. (the entity that owns BIOPURE

11   PROTEIN for "dietary supplement contain bioactive pure whey protein concentrate" in Class 5)

12   opposed BioPure's application based on priority and likelihood of confusion.  Dkt. 42 (Drangel

13   Decl.) at ¶ 13; Dkt. 42, Ex. F.[6]  BioPure and Metagenics reached a settlement whereby BioPure

14   further restricted the Class 5 goods to "(Based on Use in Commerce) Electrolytes; Nutritionally

15   fortified water; (Based on Intent to Use) Suppositories that are not marketed as protein

16   supplements."  Dkt. 42 (Drangel Decl.) at ¶ 15; Dkt. 42, Exs. I-J.

---

17

18        [5] Specifically, BioPure first attempted to register its mark in a stylized format for "air
     freshener sprays, food supplements, herbal supplements; insect repellants; mineral supplements;
19   [and] nutritionally fortified water" in December 2010.  Dkt. 42, Ex. B.  However, that
     application was denied by the USPTO in March 2011 because of a likelihood of confusion with
20   three other registered marks: (1) BIOPUREDHA for "fish oil used as a nutritional supplement,
     either alone or in combination with other ingredients [in Class 5];" (2) BIOPURE PROTEIN for
21   "dietary supplement containing bioactive pure whey protein concentration [in Class 5];" and (3)
     BIOPUR for "purifying, cleansing and hydrating skin creams, lotions and gels [in Class 3]."
22   Dkt. 42 (Drangel Decl.) at ¶¶ 7-9, Ex. C.  BioPure subsequently abandoned its application.  Dkt.
     42, Ex. D (Notice of Abandonment dated October 11, 2011).

23        [6] In response to Metagenics' opposition, BioPure argued that the respective trademarks,
     BIOPURE and BIOPURE PROTEIN, and goods in Class 5 were not confusingly similar.  Dkt.
     42, Ex. H.

1    The application for the word mark BIOPURE in a stylized format with a wave pattern

2    directly underneath it, as amended for goods and services in Class 3, 5, and 35, eventually issued

3    as U.S. Registration No. 4,696,290 ("the '290 Registration") on March 3, 2015. Dkt. 22

4    (Annicchiarico Decl.) at ¶ 26; Dkt. 22, Ex. C; Dkt. 42, Ex. K. The '290 Registration covers

5    personal deodorants, toothpastes, electrolytes, nutritionally fortified water, suppositories that are

6    not marketed as protein supplement products, on-line retail store services featuring health

7    preservation products, on-line wholesale store services featuring health preservation products,

8    retail store services featuring health preservation products, and wholesale store services featuring

9    health preservation products. *Id.* at ¶ 27; Dkt. 22, Ex. C.[7]

10    Having obtained registration of the stylized version of the BIOPURE mark, BioPure filed

11    an application with the USPTO to register the BIOPURE mark in standard characters, without

12    claim to any particular font, style, size, or color, on November 23, 2016. Dkt. 22, Ex C; Dkt. 42,

13    Ex. Q. That application was designed U.S. Serial No. 87/246,971 ("the '971 Application"), and

14    currently remains pending at the USPTO. Dkt. 22 (Annicchiarico Decl.) at ¶ 28; Dkt. 22, Ex. C

15    at 4. The '971 Application covers nutritional, dietary, and herbal supplements; suppositories;

16    herbal tinctures; electrolytes; and herbal teas for medicinal purposes (where none of the goods

17    are marketed as a protein supplement). Dkt. 22 (Annicchiarico Decl.) at ¶ 29; Dkt. 42, Ex. Q.

---

19    [7] Between April 2013 and September 2015, BioPure engaged in a similarly lengthy process to obtain Registration of the trademark BIOPURE 03 OILS. Dkt. 42 (Drangel Decl.) at ¶ 17; Dkt. 42, Ex. L. The USPTO rejected BioPure's initial application due to likelihood of confusion with the marks BIOPURE PROTEIN and BIOPUR. Dkt. 42 (Drangel Decl.) at ¶ 18; Dkt. 42, Ex. M. Plaintiff amended its application, but the USPTO denied registration due to the prior registration of BIOPURE PROTEIN. Dkt. 42 (Drangel Decl.) at ¶ 20; Dkt. 42, Ex. N. After plaintiff entered into the settlement agreement with Metagenics, a registration for BIOPURE 03 OILS in standard characters for amended Class 5 goods (dietary supplements, herbal supplements, herbal topical liniment, and all suppositories containing Ozone) was issued by the USPTO. Dkt. 42 (Drangel Decl.) at ¶¶ 21-23; Dkt. 42, Exs. O-P.

1    On March 6, 2017, an Office Action was issued for the '971 application because of a likelihood

2    of confusion with BIOPURE PROTEIN and BIOPUREDHA.  Dkt. 42 (Drangel Decl.) at ¶ 25;

3    Dkt. 42, Ex. R.  To date, BioPure has not responded to the Office Action.  Dkt. 42 (Drangel

4    Decl.) at ¶ 25.  Thus, BioPure does not currently have the registered trademark for the non-

5    stylized BIOPURE mark described in the '971 Application.  Dkt. 42, Ex. Q.

6         BioPure asserts that the company first learned of defendants' SlimQuick Pure products

7    featuring "BioPure green" in January 2017, when BioPure CEO Joseph Annicchiarico saw a

8    television commercial advertising the products.  Dkt. 22 (Annicchiarico Decl.) at ¶ 40.  Mr.

9    Annicchiarico subsequently learned that SlimQuick Pure products are being sold by WellNX,

10   which uses the name "BioPure" on the packaging, levels, and advertising for all of its SlimQuick

11   Pure products.  Id. at ¶ 41.  Because BioPure sells herbal tea and other herbal extracts under the

12   BIOPURE mark, Mr. Annicchiarico is concerned that consumers will mistakenly believe that

13   BioPure is the source of the green tea extract contained in SlimQuick Pure.  In addition, an

14   internet search for "biopure tea" produces links to both BioPure products as well as web pages

15   that describe allegations of liver damage and drug-induced hepatitis caused by SlimQuick

16   products.  Id. at ¶ 43; Dkt. 22, Ex. F.  WellNX's SlimQuick products have also been the subject

17   of lawsuits due to safety and efficacy concerns by consumers.  Dkt. 22 (Annicchiarico Decl.) at

18   ¶ 46.[8]

19        Based on the lawsuits and articles expressing consumer concerns regarding WellNX's

20   SlimQuick products, BioPure is concerned that WellNX's use of the BIOPURE mark will cause

21

22   _____

23        [8] Specifically, Mr. Annicchiarico claims that he is "aware of clinical studies that have
     shown the SlimQuick Pure products containing 'BioPure green tea' may cause health problems,
     including liver damage, in the individuals who use the products," and the media has reported on
     these various lawsuits and clinical studies.  Id. at ¶ 46.

1    irreparable harm to BioPure. Specifically, BioPure is concerned about losing control over the

2    use of its mark and the goodwill and quality attributes that consumers associate with the

3    BIOPURE mark. Dkt. 22 (Annicchiarico Decl.) at ¶ 44. If BioPure is mistakenly identified as

4    the source of the key ingredient in SlimQuick Pure products, green tea extract, plaintiff contends

5    that BioPure will be tainted by any reputational damage to SlimQuick Pure and its maker,

6    WellNX. *Id*. at ¶ 47.

7          B.  <u>WellNX Life Sciences, Inc. and its SlimQuick Pure Products</u>

8          WellNX develops and markets nutritional weight loss supplements, including those

9    marketed under the SLIMQUICK trademark. Dkt. 41 (Johnson Decl.) at ¶¶ 5, 8. WellNX is a

10   Canadian company founded in 2000, which markets and promotes itself and its products through

11   television, the WellNX website, and specific brand pages such as myslimquick.com,

12   mynaturescience.com, mypuregoddness.com, and trade shows. *Id*. at ¶ 7.

13         Although WellNX has been selling products under the SLIMQUICK trademark since

14   2005, it only recently launched its line of SlimQuick Pure products with BioPure green tea in

15   2013. *Id*. at ¶¶ 9, 11, 13.[9] WellNX's SlimQuick Pure products with BioPure green tea include

16   SlimQuick Pure caplets (caffeine free, extra strength, SlimQuick for men and weight loss

17   cleanse), SlimQuick Pure drink mix, SlimQuick Pure gummies and SlimQuick Pure protein (the

18   "SlimQuick Pure products"). *Id*. at ¶ 18. The BioPure green tea ingredient designation is always

19   used by WellNX in connection with SlimQuick Pure products, and WellNX always uses the term

20   BioPure alongside the term "green tea." *Id*. at ¶ 17. WellNX does not sell any stand-alone

21   BioPure green tea products. *Id*.

22   _____

23       [9] The SlimQuick brand is the number one-bestselling brand in the weight-loss category
for products specifically designed for women and the fourth best-selling brand in the diet
category.

SlimQuick Pure products are primarily sold via mass third-party retailers in the United States and Canada such as Target, Walmart, Walgreens, CVS, Kroger, and Amazon.com. *Id.* at ¶ 22. Although WellNX promotes and offers SlimQuick Pure Products for sale on its website, www.myslimquick.com, such sales comprise a small percentage of WellNX's overall sales. *Id.* at ¶ 23. WellNX primarily advertises and promotes SlimQuick Pure Products via its website, www.myslimquick.com, a television commercial spot on cable television channels like MTV, BET, and E!, and with third-party retailers. *Id.* at ¶¶ 18-19, 20, 24. WellNX does not advertise, promote, or distribute SlimQuick Pure products to healthcare professionals. *Id.* at ¶ 24.

All the SlimQuick Pure products contain a green tea extract, referred to as "BioPure green tea." *Id.* at ¶¶ 12-17; Dkt. 41, Ex. A. This green tea extract is comprised of a high concentration of epigallocatechin-3-gallet ("EGCG") encapsulated in a soy phytosome, called GREENSELECT, that WellNX purchases from Indena, S.P.A. of Milan, Italy. Dkt. 42 (Drangel Decl.) at ¶ 5; Dkt. 42, Ex. A (Greenselect trademark registration); Dkt. 41 (Johnson Decl.) at ¶ 12-14. Green tea, and specifically, EGCG, is frequently included in weight loss supplements. Dkt. 41 (Johnson Decl.) at ¶¶ 15-16; Dkt. 41, Ex. B. WellNX's BioPure green tea is not water soluble, and is incapable of being brewed on its own like a traditional tea. Dkt. 41 (Johnson Decl.) at ¶ 35. Because BioPure green tea can only function as an ingredient in another product, or in a pill or capsule form, it is not sold by WellNX directly to consumers. *Id.*

With respect to BioPure's allegations of reputational harm, WellNX admits to having been involved in prior multidistrict litigation, *In re: Wellnx Marketing and Sales Practices Litigation*, Case No. 1:07-md-01861, based on allegations that certain SlimQuick products sold through August 2011 caused health problems to consumers. However, WellNX settled the case without admitting fault or liability. Dkt. 41 (Johnson Decl.) at ¶¶ 40-41. WellNX also points out

1  that the products at issue in that lawsuit were not the SlimQuick Pure products with BioPure

2  green tea, and WellNX chose to discontinue the products at issue. *Id.* at ¶ 41. WellNX asserts

3  that there has never been a finding by a government agency or otherwise that the SlimQuick Pure

4  products are unsafe or cause health issues. *Id.* at ¶ 43.

5      Finally, WellNX points out that apart from plaintiff, there are several third parties that

6  use the term "BioPure" or a derivation thereof (including BIOPURE PROTEIN and

7  BIOPUREDHA) in connection with products in the health and wellness industry without causing

8  consumer confusion. *Id.* at ¶ 37. WellNX asserts that it is not aware of any instances of

9  consumer confusion between WellNX and/or the SlimQuick Pure Products with BioPure green

10  tea and any third parties using the term "BioPure," including plaintiff. *Id.* at ¶ 39.

III.    DISCUSSION

12  A.    <u>Legal Standards</u>

13      The Court may issue a preliminary injunction where the plaintiff establishes that (1) they

14  are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of

15  preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the

16  public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). The Ninth Circuit

17  has held that "serious questions going to the merits" and a balance of hardships that tips sharply

18  towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also

19  shows that there is a likelihood of irreparable injury and that the injunction is in the public

20  interest. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134-35 (9th Cir. 2011).[10] If

21  granted, any injunction should be tailored "to eliminate only the specific harm alleged," while

22  _____

23      [10] "Serious questions" are those that are "substantial, difficult and doubtful, requiring a more thorough investigation." *Rep. of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir. 1988).

1   not making the injunction "so narrow as to invite easy evasion." *Skydive Arizona, Inc. v.*

2   *Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (quotations omitted).

3          B.    Merits of Plaintiff's Case

4          The Court turns to the first *Winter* prong: the likelihood that plaintiff will

5   succeed on the merits of its trademark infringement claim.  Although plaintiff raises a variety of

6   claims in its complaint, its request for an injunction is based primarily on its claim for trademark

7   infringement in violation of the Lanham Act. The Lanham Act prohibits the "use[ ] in commerce

8   [of] any word, term, name, symbol, or device, or any combination thereof, or any false

9   designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to

10  the affiliation, connection, or association of such person with another person, or as to the origin,

11  sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a)(1)(A).

12         In any trademark case, likelihood of confusion is the touchstone.  A plaintiff alleging

13  trademark infringement must show that the alleged infringer (1) used in commerce, (2) a word,

14  false designation or origin, false or misleading description, or representation of fact that (3) is

15  likely to cause confusion or misrepresents the characteristics of its or another entity's goods or

16  services. *Freecycle Network Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007).

17         To determine whether a likelihood of confusion exists for a reasonable consumer in the

18  marketplace, the Ninth Circuit Court of Appeals suggests consideration of the following eight

19  factors, first collected in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)

20  (abrogated on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.10

21  (9th Cir. 2003)).  The *Sleekcraft* factors are: (1) strength of the mark; (2) proximity or relatedness

22  of the goods; (3) similarity of sight, sound, and meaning; (4) evidence of actual confusion; (5)

23  marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of

1    expansion. 599 F.2d at 348–49. A claimant can establish likelihood of confusion without

2    satisfying all of the *Sleekcraft* factors. *See Dreamwerks Prod. Grp., Inc.,* 142 F.3d 1127, 1129

3    (9th Cir. 1998). The factors are intended as guideposts only, and the weight to be afforded to

4    each depends on the circumstances of the case. *Id.* ("The factors should not be rigidly weighed;

5    we do not count beans."); *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 631 (9th Cir.

6    2005) ("The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong

7    showings are made with respect to some of them.").

8            Here, BioPure contends that three *Sleekcraft* factors weigh heavily in plaintiff's favor

9    and demonstrate that confusion is likely: (1) the marks are the same ("BioPure"); (2) the goods

10   are the same (tea) or closely related (tea and herbal extracts); and (3) both parties share the same

11   significant channel of distribution (direct online web sales). BioPure alleges that the remaining

12   *Sleekcraft* factors are neutral, and therefore the balance of the *Sleekcraft* factors support the

13   existence of likelihood of confusion.

14           WellNX asserts that the insurmountable challenge for BioPure is that it has not, and

15   cannot, prove that it has an enforceable right in the term "biopure" or that there is a likelihood of

16   confusion resulting from WellNX's use of BioPure green tea. Dkt. 40 at 4. WellNX contends

17   that the BIOPURE mark registration cannot be relied upon to show inherent distinctiveness, and

18   BioPure has also failed to demonstrate acquired distinctiveness. Finally, WellNX contends that

19   BioPure and WellNX's products bearing their respective marks have peacefully coexisted for

20   nearly four years, demonstrating no likelihood of confusion by consumers.

21

22

23

1    (1) *Strength of the BioPure Mark*

2    BioPure alleges that the BioPure mark is suggestive for all goods on which it is used, and

3    the mark has inherent distinctiveness.  BioPure asserts that "because WellNX is using the

4    BIOPURE mark on the same and closely related goods, namely, tea, the strength factor is not

5    particularly important in the evaluation of likely confusion in this case." Dkt. 20 at 17.  As a

6    result, BioPure believes that this factor should be considered neutral in the Court's analysis.

7    WellNX asserts that because the BioPure registration is for the BIOPURE stylized mark

8    with a wave underneath the words, any presumption with regard to validity and ownership is

9    limited to the mark as it appears in the registration and to the specific goods in the registration.

10    Dkt. 40 at 5 (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047

11    (9th Cir. 1999) (a party's "registration of the mark on the Principal Register in the Patent and

12    Trademark Office constitutes prima facie evidence of the validity *of the registered mark* and of

13    [the party's] exclusive right to use the mark *on the goods and services specified in the*

14    *registration*") (emphasis added).  WellNX asserts that in this action BioPure is attempting to rely

15    on the BIOPURE registration for WellNX's use of the non-stylized "biopure" mark in

16    connection with "electrolytes; nutritionally fortified water" and "on-line retail store services

17    featuring health preservation products; on-line wholesale store services featuring health

18    preservation products; retail store services featuring health preservation products; [and] whole

19    sale store services featuring health preservation products." Dkt. 20 at 6.  Specifically, BioPure is

20    concerned with teas, extracts and herbal supplements.  However, the BIOPURE Registration is

21    actually restricted to the BioPure stylized mark relevant to the following Class 5 goods:

22    "electrolytes; nutritionally fortified water; suppositories that are not marked as protein

23    supplement products." *Id.*

1    As a result, WellNX argues that "any presumption of validity based on inherent

2  distinctiveness is wholly inapplicable" and BioPure must prove that it has acquired

3  distinctiveness in its alleged BIOPURE mark as applied to teas, extracts and supplements for

4  purposes of establishing a likelihood of success on the merits of its trademark infringement

5  claim.  Dkt. 40 at 5.  WellNX contends that BioPure has failed to do this, and cannot because

6  "biopure" is a highly descriptive term used by many third parties for the same/similar goods, and

7  therefore BioPure cannot claim exclusive rights.

8    The purpose of examining the strength of the plaintiff's mark is to determine the scope of

9  trademark protection to which the mark is entitled. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d

10  1135, 1141 (9th Cir. 2002).  In examining the strength of the mark, the strength of the senior

11  mark determines the scope of trademark protection to which it is entitled, while the strength of

12  the junior mark determines whether it is so strong as to overtake the senior mark. *Surfvivor*

13  *Media*, 406 F.3d at 631 n.3.  Strength is a function of both inherent qualities of the mark and

14  acquired or commercial qualities of the mark. *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d

15  1277, 1281 (W.D. Wash. 2003*), aff'd*, 376 F.3d 894 (9th Cir. 2004).

16    Trademarks may fall into one of five categories of increasing distinctiveness: (1) generic,

17  (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *See Two Pesos, Inc. v. Taco Cabana,*

18  *Inc.*, 505 U.S. 763, 768 (1992); *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108,

19  1115 (9th Cir. 2013).  The two strongest sets of marks are "arbitrary" and "fanciful" marks,

20  which trigger the highest degree of trademark protection. *Entrepreneur Media*, 279 F.3d at

21  1141.[11]  The third category, "suggestive" marks, do not "describe the product's features but

22

23    [11] "Arbitrary" marks are common words that have no connection with the actual
product—for example, "Dutch Boy" paint. *See Dreamwerks*, 142 F.3d at 1130 n.7.  "Fanciful"
marks consist of "coined phrases" that also have no commonly known connection with the

1  suggest[ ] them." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047

2  n.8 (9th Cir. 1998) (emphasis omitted).  Examples include "Slickcraft" boats or "Air Care," for a

3  service that maintains medical equipment for administering oxygen.  *Id.  See also Sleekcraft*, 599

4  F.2d at 349.  The fourth category of marks is referred to as "descriptive."  *Kendall-Jackson*

5  *Winery*, 150 F.3d at 1047.  An example of a descriptive mark is "Honey Roasted" for nuts

6  roasted with honey.  *Id.*  Because these marks merely describe a characteristic of the product,

7  they do not receive any trademark protection unless they acquire sufficient "secondary meaning"

8  to create an association between the mark and the product.  *Id.*

9       The Ninth Circuit has generally applied one or two tests to differentiate between

10  suggestive and merely descriptive marks.  The most widely used test is the "imagination test,"

11  which asks whether "imagination or a mental leap is required in order to reach a conclusion as to

12  the nature of the product being referenced."  *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195,

13  1198 (9th Cir. 2007).[12]  The second test, the "competitors' needs" test, "focuses on the extent to

14  which a mark is actually needed by competitors to identify their goods or services."  *Zobmondo*

15  *Entm't*, 602 F.3d at 1117 (citing *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th

16  Cir. 1987)).  If competitors have a great need to use a mark, the mark is probably descriptive; on

17  the other hand, if "the suggestion made by the mark is so remote and subtle that it is really not

18  likely to be needed by competitive sellers to describe their goods or services[,] this tends to

19  indicate that the mark is merely suggestive."  *Id.*  This test is related to the imagination test,

20

21  _____

    product at hand.  *Id.*  Examples of fanciful marks include "Kodak" cameras or "Aveda" skin care
22  products.  *Id.*
    [12] For example, the mark "ENTREPRENEUR" as applied to a magazine was descriptive,
23  and not suggestive, because it directly described the quality or features of the product and "an
    entirely unimaginative, literal-minded person would understand the significance of the
    reference."  *Entrepreneur Media*, 279 F.3d at 1142.

"because the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services." *Id.*

The final category of marks consists of "generic" marks, which describe the product in its entirety, and which are not entitled to trademark protection. *Two Pesos*, 505 U.S. at 769 (describing a generic term as one that refers to the genus of which the particular product is a species). Examples include "Liquid controls" for equipment that dispenses liquid, or "Multistate Bar Examination" for a bar examination that may be taken across multiple states. *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8. *See also Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir. 1982).

Identifying whether a mark is arbitrary, fanciful, suggestive, descriptive, or generic, however, is only the first step of the inquiry. The second step is to determine the strength of the mark in the marketplace, i.e., the commercial strength of the mark. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009). "When similar marks permeate the marketplace, the strength of the mark decreases. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." *Id.* (internal quotation marks omitted).

Here, it is undisputed that BioPure has priority of use with respect to the BIOPURE mark. WellNX first used the BIOPURE mark with its SlimQuick Pure products "with BioPure green tea" in 2013. Dkt. 41 (Johnson Decl.) at ¶ 11. By contrast, BioPure has used the BIOPURE mark on products since 2005, and since 2010 for herbal teas. Dkt. 19 (Annicchiarico Decl.) at ¶¶ 23-24. Thus, BioPure is the senior user of the mark.

Although only the stylized version of the BIOPURE mark is registered with the USPTO, the Court finds that BioPure has nevertheless demonstrated that the BIOPURE mark is inherently distinctive for all of the related goods on which BioPure uses the mark, including herbal tea and herbal extracts. *See Two Pesos*, 505 U.S. at 769. Specifically, the BIOPURE mark falls into the "suggestive" category under the two common tests the Ninth Circuit uses to differentiate between suggestive and descriptive marks. *See Sleekcraft*, 599 F.2d at 349 ("Although less distinctive than an arbitrary or fanciful mark and therefore a comparably weak mark, a suggestive mark will be protected without proof of secondary meaning.").

First, under the imagination test, the Court concludes that at least some "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Rudolph Int'l.*, 482 F.3d at 1198. "BioPure" is a coined term that cannot be looked up in the dictionary, and therefore a consumer could only consider the dictionary meanings of separate components of the mark, the prefix "bio-" (which means "life" or "living organism") and "pure" (which means having a homogeneous or uniform composition). Dkt. 45, Ex. B (American dictionary definitions). Connecting the meaning of these terms to BioPure's herbal teas and extracts requires an even greater mental leap. Thus, a consumer must use multi-stage reasoning to connect the BIOPURE mark to the teas, herbal extracts, and related nutritional supplements on which BioPure uses the mark, which means that the BIOPURE mark is suggestive rather than descriptive in nature.

Similarly, under the alternative "competitors' needs" test, which focuses on the extent to which a mark is actually needed by competitors to identify their goods or services, the Court is not persuaded that WellNX (or any other maker of teas, extracts or other nutritional supplements) *needs* to use the term "BioPure" to adequately describe or identify their goods. As

discussed above, the word "biopure" has no dictionary definition or independent meaning.

Although several other entities, including BIOPURE PROTEIN and BIOPUREDHA are using a

similar mark, these companies do not claim to be using the term "biopure" descriptively.

Finally, the Court finds that BioPure has made an adequate showing that its mark is

commercially strong. Dkt. 23 at 5-6; Dkt. 24 (Sealed Annicchiarico Decl.) at ¶¶ 35-39. BioPure

has had increasing sales revenue nearly every year since the company's inception in 2005. Dkt.

24 (Sealed Annicchiarico Decl.) at ¶ 35. In fact, BioPure has generated millions of dollars in

sales revenue from products branded with the BIOPURE mark between 2005 and 2017. *Id.* at ¶¶

33-39.[13] WellNX's contention that the commercial strength of BioPure's mark is weakened by

virtue of the fact that there are numerous other companies using similar marks is unpersuasive.

Although WellNX asserts that there are roughly 52 marks in the USPTO database containing the

term "BioPure," most of those registrations have been abandoned or cover goods and services

completely unrelated to BioPure's goods. A search for active U.S. federal trademark

registrations incorporating the term "biopure" in classes 3 and 5 return eleven records, four of

which are owned by BioPure. Dkt. 45 (Shewmake Decl.) at ¶ 3, Ex. A. Marks that are used in

unrelated industries or relating to dissimilar products do not diminish the strength of BioPure's

mark. *See e.g.*, *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990)

(upholding a trial court's exclusion of evidence related to third-party use of marks in unrelated

industries); *Du Barry of Hollywood, Inc. v. Richard Hudnut*, 323 F.2d 986, 988 (9th Cir. 1963)

("The fact that goods and services unrelated to this class of products have, on occasion, been

---

[13] As noted above, BioPure has been continuously selling herbal tea under the BIOPURE
mark since March 2010. BioPure's sales revenue for BIOPURE-branded Cistus Tea between
2010 and 2017 has also generally increased each year. *Id.* at ¶¶ 37-39.

REPORT AND RECOMMENDATION - 17

1  offered for sale to the public under the name 'Du Barry' does not diminish the strength of

2  Hudnut's mark in its own field of cosmetics, toiletries and related articles for women.")

3        Accordingly, the Court rejects WellNX's argument that any presumption of validity

4  based on inherent distinctiveness is inapplicable due to the fact that BioPure has not yet obtained

5  formal registration of its mark in standard characters as applied to teas, extracts, and supplements

6  from the USPTO.  Although BioPure has not yet obtained formal registration of the BIOPURE

7  mark in standard characters, the mark nevertheless serves as a source-identifier that is entitled to

8  narrow trademark protection.  It is undisputed this is a crowded field, as several other companies

9  use "BioPure" as part of their trademark.  As a result, the scope of protection is limited to tea and

10  tea-related products or ingredients.

11        As the Court finds that the BIOPURE mark is suggestive rather than descriptive, and also

12  commercially strong in the marketplace, the Court declines WellNX's invitation to resolve this

13  *Sleekcraft* factor in its favor.  The Court also disagrees with BioPure's assertion that this factor

14  should be considered "neutral."  *See* Dkt. 43 at 10.  Instead, the Court finds that the "strength" of

15  BioPure mark in this narrow marketplace of tea and tea-related products weighs slightly in favor

16  of BioPure in the likelihood of confusion analysis.

17        (2) *Proximity or Relatedness of the Goods*

18        As discussed above, BioPure uses the BIOPURE mark on the company's herbal tea,

19  herbal extracts, and related health products.  Dkt. 22 (Annicchiarico Decl.) at ¶¶ 18-24, Ex. B.

20  WellNX uses the mark in connection with its SlimQuick Pure products "with BioPure green tea,"

21  which promote weight loss.  Dkt. 24, Ex. E (photographs of SlimQuick Pure products).

22        The similarity of the parties' products is "relevant to the confusion analysis in that for

23  related goods, the danger presented is that the public will mistakenly assume there is an

1    association between the producers of the related goods, though no such association exists.  The

2    more likely the public is to make such an association, the less similarity in the marks is requisite

3    to a finding of likelihood of confusion." *Sleekcraft,* 599 F.2d at 350.  The public is likely to

4    make such an association when the goods are complementary, products are sold to the same class

5    of purchasers, or the goods are similar in use and function.  *See id.; see also Brookfield*

6    *Commc'ns,* 174 F.3d at 1056 ("[T]he relatedness of each company's prime directive isn't

7    relevant.  Instead the focus is on whether the consuming public is likely somehow to associate

8    West Coast's products with Brookfield.") (internal citation omitted); *Golden Door, Inc. v.*

9    *Odisho*, 646 F.2d 347, 350 (9th Cir. 1980) ("[T]here is sufficient similarity in the general nature

10   of the two businesses to support the district court's finding.").

11          WellNX emphasizes the fact that BioPure does not sell green tea, or products containing

12   green tea extract, but only sells herbal teas and herbal tea-related products.  As noted above,

13   herbal tea is not made from the leaves of the tea bush, Camelia Sinesis, but refers to any non-

14   caffeinated infusion comprised of herbs, flowers, fruits and other plant materials.  Dkt. 41

15   (Johnson Decl.) at ¶¶ 25-26.  By contrast, green tea is only made from the leaves of the tea bush.

16   *Id.* at ¶ 25.  WellNX does not sell herbal teas, and only uses the term "BioPure" in connection

17   with its products that contain green tea extract.  In addition, while "BioPure green tea" appears

18   on the packaging and is mentioned in the advertisements and/or marketing materials for

19   SlimQuick Pure products, the BioPure green tea ingredient is never prominently featured apart

20   from the SLIMQUICK trademark.  *Id.* at ¶ 21. WellNX claims that the companies' products are

21   dissimilar enough that they can peacefully coexist in the marketplace without causing consumer

22   confusion.

23

1       Although the Court is cognizant of the differences between herbal tea and green tea,

2  the Court finds that the public is likely to make an association between the WellNX and BioPure

3  tea products at issue in this case.  The Ninth Circuit has held that "related goods (or services) are

4  those 'which would be reasonably thought by the buying public to come from the same source if

5  sold under the same mark.'"  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212-

6  1213 (9th Cir. 2012) (quoting *Sleekcraft*, 599 F.2d at 348 n.10)).  Although green tea and herbal

7  tea are different products, both are marketed and enjoyed by consumers as "tea."  It is

8  reasonable for consumers to believe that herbal tea and green tea products sold under the same

9  mark originate from the same source, because it is commonplace for tea brands to sell both green

10  tea and herbal tea under a single brand.  Indeed, green tea and herbal tea are frequently sold side

11  by side in retail stores to the same class of purchasers for similar prices, and have similar use and

12  function (i.e., brewing and drinking for enjoyment or other health benefits).  For example,

13  companies such as Lipton, Celestial Seasonings, Bigelow, Stash, and Twinings all sell both

14  herbal and green teas to their consumers under the same trademark.  Dkt. 45 at 3-4; Dkt. 45, Ex.

15  C.  Although "BioPure green tea" is an ingredient in SlimQuick Pure products, and is not brewed

16  and consumed simply as green tea, it is nevertheless a "tea-related product or ingredient" and

17  consumers who are familiar with BioPure's herbal teas and related products are likely to make an

18  association.  The potential association of BioPure's tea products with the SlimQuick Pure

19  products is particularly pronounced in the SlimQuick Pure television advertising, which

20  highlights "BioPure green tea" as the key ingredient causing weight loss.  *See* Dkt. 27 (Levy

21  Decl.), Ex. C (CD of commercials).

22       Accordingly, the Court finds that the goods at issue are the same (tea) or highly similar

23  (tea and herbal extracts).  The fact that WellNX does not sell "stand-alone" green tea products,

1    but only products containing green tea extract as an ingredient, does not undermine the

2    possibility of consumer confusion in light of BioPure's established history of selling herbal

3    extracts and related products.  As a result, consumers could reasonably think that WellNX's

4    "BioPure green tea" extract originated from BioPure, or otherwise make an association between

5    the similar goods.  This *Sleekcraft* factor favors BioPure and a finding of a likelihood of

6    confusion.

7            (3) *Similarity of Sight, Sound, and Meaning of the BIOPURE marks*

8            The Ninth Circuit has "developed certain detailed axioms to guide [the] comparison" of

9    the parties' marks.  *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).

10   First, the marks must be considered in their entirety and as they appear in the marketplace.  *Id.*

11   Second, the similarity of competing marks "is tested on three levels: sight, sound, and meaning."

12   *Sleekcraft*, 599 F.2d at 351.  Third, similarities are weighed more heavily than differences.  *Id.*

13           Here, the Court finds that WellNX is using the BIOPURE mark in virtually the same

14   form as BioPure, with only three minor differences in appearance.  First, WellNX only uses the

15   word "BioPure" on its labels as part of the complete phrase "with BioPure green tea."  However,

16   the addition of a descriptive or generic matter to another's mark is not sufficient to avoid

17   confusion.  *See e.g., Miss Universe, Inc. v. Flesher*, 433 F. Supp. 271, 273-74 (C.D. Cal. 1977)

18   (granting preliminary injunction against MISS NUDE U.S.A. mark in view of plaintiff's MISS

19   U.S.A. mark).  Second, WellNX does not include the stylized "wave" symbol underneath the

20   word "BioPure" that BioPure uses on its product labels. Dkt. 24 (Sealed Annicchiarico Decl.) at

21   ¶¶ 26, 41; DKt. 24, Ex. E.  Third, the only apparent difference in the font used for the word

22   "BioPure" is that the lowercase letters "u" and "r" are slightly cut off in BioPure's stylized

23

1   version, as if the letters in the word "Pure" are squished together and overlapping slightly.  Dkt.

2   24 (Sealed Annicchiarico Decl.) at ¶ 26.

3        Apart from these minor differences, the parties' use of the BIOPURE mark is identical in

4   sight, sound, and meaning.  Both companies are using the exact same word, BioPure, with capital

5   letters "B" and P."  WellNX also appears to be using the word "BioPure" as its own brand, based

6   upon the larger size of the font and the set-off of the word "BioPure" from the smaller words

7   "with," which precedes it, and "green tea," which follows it, on the labels of the SlimQuick Pure

8   products.  Dkt. 24, Ex. E.  WellNX has not suggested that its use of the word "BioPure" has a

9   different meaning or connotation from that described by BioPure.  In particular, WellNX's

10  television commercials advertising its SlimQuick Pure products emphasize "BioPure green tea"

11  as the key ingredient that causes weight-loss benefits.  Dkt. 27 (Levy Decl.), Ex. C (CD of

12  commercials).  Accordingly, the Court finds that the similarity in sight, sound and meaning

13  between the two BIOPURE marks also favors BioPure and a finding of likelihood of confusion.

14        (4) *Evidence of Actual Confusion*

15        To constitute trademark infringement, use of a mark must be likely to confuse an

16  appreciable number of people as to the source of the product.  *See Entrepreneur Media,* 279 F.3d

17  at 1151 (citing *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CID v. Winship Green*

18  *Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996) ("[T]he law has long demanded a showing that

19  the allegedly infringing conduct carries with it a likelihood of confounding an appreciable

20  number of reasonably prudent purchasers exercising ordinary care.")).  Actual confusion is hard

21  to prove, and therefore the absence of such evidence is generally not noteworthy.  *See Brookfield*

22  *Commc'ns*, 174 F.3d at 1050.  Where it exists, however, evidence of actual confusion as to the

23  source of a product is "persuasive proof that future confusion is likely."  *Sleekcraft*, 599 F.2d at

1    352. This Court has observed that "when the duration of non-confusing co-existence stretches

2    into years, the inference against finding a likelihood of confusion strengthens." *eAcceleration*

3    *Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1118 (W.D. Wash. 2006) (citing 3 J. Thomas

4    McCarthy, *McCarthy on Trademarks,* § 23:18 (4th ed. 2005); *Brookfield Commc'ns,* 174 F.3d at

5    1050)).

6        To date, neither party has presented any evidence of actual confusion to consumers

7    resulting from both WellNX and BioPure's use of the BIOPURE mark.  WellNX argues that

8    because plaintiff has not presented any evidence of actual confusion, despite the co-existence of

9    the competing marks for the past few years, this factor weighs in favor of WellNX.

10       The Court, however, finds that such a conclusion would be premature.  In light of the fact

11   that discovery has not yet been conducted in this case, the Court finds that this factor is neutral.

12   *See eAcceleration Corp.,* 408 F. Supp. 2d at 1118 ("With no evidence either way, and no

13   discovery having been conducted, this factor is also neutral.").

14       (5) *Marketing Channels*

15       "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599

16   F.2d at 353.  Both parties' use of the Internet as a marketing tool is "a factor that courts have

17   consistently recognized as exacerbating the likelihood of confusion." *Brookfield Commc'ns*, 174

18   F.3d at 1057.  "*Some* use of the Internet for marking, however, does not alone and as a matter of

19   law constitute overlapping marketing channels." *Entrepreneur Media*, 279 F.3d at 1151

20   (emphasis in original).  "The proper inquiries are whether both parties use the Web as a

21   substantial marketing and advertising channel, whether the parties' marks are utilized in

22   conjunction with Web-based products, and whether the parties' marketing channels overlap in

23   any other way." *Id.* (internal quotations and citations omitted).

1    As discussed above, BioPure markets and distributes its products to consumers through

2  two channels: (1) direct online sales and distribution to consumers in all 50 states, including

3  Puerto Rico and Guam, and (2) wholesale distribution to a network of over 1,700 healthcare

4  professionals in 49 states who resell BioPure products to their clients.  Dkt. 22 (Annicchiarico

5  Decl.) at ¶¶ 30, 32.  All of BioPure's products are also marketed and sold through the company's

6  website, www.biopureus.com.  *Id.* at ¶ 31.  Direct online sales make up more than 20% of

7  BioPure's sales.  *Id.*  Healthcare professionals without an in-house dispensary also purchase the

8  products through the BioPure website.

9    WellNX's SlimQuick Pure products are primarily sold directly to consumers via mass

10  third-party retailers in the United States and Canada such as Target, Walmart, Walgreens, CVS,

11  Kroger, and Amazon.com.  Dkt. 41 (Johnson Decl.) at ¶ 22.  Although WellNX promotes and

12  offers SlimQuick Pure Products for sale on its website, www.myslimquick.com, such sales

13  comprise a small percentage of WellNX's overall sales.  *Id.* at ¶ 23.  WellNX primarily

14  advertises and promotes SlimQuick Pure Products via its website, www.myslimquick.com, a

15  television commercial spot on cable television channels like MTV, BET, and E!, and with third-

16  party retailers.  *Id.* at ¶¶ 18-19, 20, 24.  WellNX does not advertise, promote or distribute

17  SlimQuick Pure products to healthcare professionals.  *Id.* at ¶ 24.

18    Although there are some notable differences with respect to WellNX and BioPure's

19  primary marketing and distribution strategies, *i.e.*, BioPure targets healthcare practitioners as

20  well as consumers, there is also substantial overlap in marketing channels due to both

21  companies' reliance on the Internet.  BioPure indicated that consumers as well as some

22  healthcare practitioners rely on its website to obtain BioPure products.  WellNX failed to provide

23  any estimates or figures regarding what percentage of its annual sales of SlimQuick Pure

REPORT AND RECOMMENDATION - 24

1  products result from Internet sales, stating only that such sales comprise a "small percentage" of

2  overall sales.  However, WellNX concedes that it has developed numerous webpages devoted to

3  marketing and promoting its various products and brands, such as myslimquick.com,

4  mynaturescience.com, mypuregoddness.com, and trade shows.  Dkt. 41 (Johnson Decl.) at ¶ 7.

5  The fact that WellNX has such a significant web presence suggests that the Internet is a

6  significant source of marketing for WellNX, even if most of WellNX's sales are completed at

7  third-party retail stores instead of online.

8         Accordingly, the Court finds that both parties use the Internet as a substantial marketing

9  and advertising channel.  In addition, BioPure has presented evidence that consumers searching

10  online for "biopure tea" could be directed to either BioPure or WellNX's respective websites.

11  Dkt. 22 (Annicchiarico Decl.) at ¶ 42; Dkt. 22, Ex. F.  The Court therefore finds that this factor

12  weighs in favor of BioPure and a finding of likelihood of confusion.

13         (6) *Type of Goods and Purchaser Care; WellNX's Intent; Likelihood of Expansion*

14         BioPure alleges that the remaining *Sleekcraft* factors – defendants' intent, expansion of

15  product lines, and level of consumer care - are "neutral" in this case.  Dkt. 43 at 10 (citing *Pom*

16  *Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1131-32 (9th Cir. 2014)).  WellNX expressed

17  agreement with BioPure that its intention in selecting "BioPure green tea" should be considered a

18  neutral factor, and fails to provide any arguments with respect to the remaining *Sleekcraft*

19  factors.  Dkt. 40 at 17-18.  As a result, the Court finds these factors to be neutral in its analysis.

20         (7) *Summary of Sleekcraft Analysis*

21         As mentioned above, the relative import of each of the *Sleekcraft* factors is case-

22  dependent.  The Court has found that WellNX's intent, expansion of product lines, and level of

23  consumer care are neutral in the analysis.  However, the remaining *Sleekcraft* factors (the

1    strength of the BIOPURE mark; proximity or relatedness of the goods; similarity of sight, sound

2    and meaning; and marketing channels) all favor BioPure, because they indicate a likelihood of

3    consumer confusion.  These factors persuade the Court that plaintiff is likely to succeed in

4    proving that consumers are likely to assume that BioPure is associated with WellNX's weight

5    loss products containing "BioPure green tea."

6          C.    The Court Finds that BioPure Would Likely Suffer Irreparable Harm Absent the
          Requested Injunctive Relief

7           WellNX contends that no irreparable harm will result from continued use of "BioPure

8    green tea" on its SlimQuick Pure products because plaintiff cannot prove tangible losses, and

9    BioPure offers "no verifiable evidence in support of any supposed harm" such as "negative

10    associations" claimed to be associated with WellNX or its products.  Dkt. 40 at 19.  WellNX

11    vehemently contests the validity of the various news articles, prior lawsuits, and alleged

12    statements from consumers challenging the safety and efficacy of WellNX's SlimQuick

13    products, arguing that no clinical studies or government agencies have confirmed that there are

14    significant health risks associated with SlimQuick Pure products containing BioPure green tea.

15    *Id.* at 20-21.

16           WellNX misses the point.  The harm arising from likelihood of confusion does not need

17    to be tangible; it can be instead the senior user's loss of "the value of [its] trademark, its product

18    identity, corporate identity, control over its goodwill and reputation, and ability to move into new

19    markets." *Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F.Supp.2d 1294, 1307 (W.D.

20    Wash. 2010).  *Accord Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir.

21    1987); *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) (quoting *Ameritech*).  The

22    evidence the Court has reviewed demonstrates that BioPure has suffered each of these harms by

23    virtue of WellNX's use of the "BioPure green tea" designation in connection with its SlimQuick

1    Pure products, and will continue to do so.  Regardless of whether SlimQuick products containing

2    "BioPure green tea" actually cause liver damage or are otherwise ineffective, it is undeniable that

3    WellNX has received negative media attention associated with these allegations.  BioPure has

4    presented evidence that some consumers do not have a favorable view of WellNX's products.

5    This perception among consumers is what would cause the reputational harm to BioPure, which

6    will have lost control over its brand and reputation.  Regardless of whether WellNX's products

7    are perceived favorably or with disdain, BioPure is left with no way to stop users from

8    associating its brand with WellNX's SlimQuick Pure weight-loss products.  This is a likelihood

9    of irreparable harm to plaintiff, which can only be avoided by the injunctive relief requested by

10   BioPure.  *See Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251

11   (9th Cir. 2013) ("Those seeking injunctive relief must proffer evidence sufficient to establish a

12   likelihood of irreparable harm.").

13          The Court is also unpersuaded by WellNX's suggestion that the irreparable nature of any

14   likely harm to BioPure is undermined by BioPure's excessive delay in seeking injunctive relief.

15   BioPure's CEO asserts in his declaration that he first learned of WellNX's use of the "BioPure

16   green tea" designation in January 2017, when he saw a commercial for the SlimQuick Pure

17   products.  Dkt. 24 (Annicchiarico Decl.) at ¶ 40.  BioPure filed this action only two months later

18   in March 2017, Dkt. 1, and the instant motion for preliminary injunction in May 2017, Dkt. 20.

19   A delay of only a few months, especially where the parties were attempting to resolve the dispute

20   amicably during the period of delay, is not unreasonable.  *See Ocean Garden, Inc. v. Marktrade

21   Co.*, 953 F.2d 500, 508 (9th Cir. 1991) (sixth month delay in seeking preliminary injunction after

22   filing complaint did not bar injunctive relief because the parties were involved in settlement

23   negotiations during that time).  BioPure has provided evidence that such efforts caused the two to

1   four month delay between its initial discovery of WellNX's products containing "BioPure green

2   tea" and its filing of the instant motion for a preliminary injunction. Dkt. 44 (Linford Decl.) at

3   ¶¶ 3-9, Exs. A-F. The Court therefore finds that a delay of a few months, under the

4   circumstances, was not unreasonable.

5          D.    Balance of Equities/Hardships and the Public Interest

6          Finally, the Court finds that the balance of equities and public policy favor granting

7   BioPure's request for a preliminary injunction. The Court has already considered, and rejected,

8   WellNX's contention that any harm to BioPure is merely speculative in nature. Similarly,

9   WellNX has not presented any evidence suggesting that substantial harm to WellNX would

10   result from granting BioPure's request for injunctive relief based upon the time, money, and

11   effort WellNX has invested in promoting its SlimQuick Pure products as containing "BioPure

12   green tea." *See* Dkt. 40 at 23. For example, WellNX has not shown that it would suffer any

13   great financial harm by rebranding its SlimQuick Pure products as containing simply "green tea"

14   or "green tea extract," and removing the reference to "BioPure."

15          To the extent the public has any interest in the outcome of this case, it is in permitting

16   businesses and business owners who have invested in branding their products from losing control

17   over their brands. In that sense, the public interest favors BioPure. *See Brookefield*, 174 F.3d at

18   1066 (noting "public interest in protecting trademarks generally").

19          IV.    CONCLUSION

20          Based on the foregoing, the Court recommends that the Honorable Robert S. Lasnik enter

21   the following preliminary injunction pending trial in this matter, to take effect **thirty (30) days**

22   after his adoption of this Report and Recommendation, in order to provide defendant with

23   sufficient time to alter its packaging:

Defendants, their respective principals, partners, franchisees, agents, employees, licensees, affiliates, distributors, producers, attorneys and representatives and all of those in privity with or acting under the direction or control of any of them, are preliminarily enjoined and restrained from:

1. Using "BioPure" or any term or mark confusingly similar to "BioPure", in connection with the advertisement, promotion, distribution, offering for sale or selling of any goods or services involving or relating to tea, including without limitation the use of "BioPure" in connection with the green tea ingredient of SlimQuick Pure products;

2. Performing any acts or using any trademarks, names, words, images or phrases that are likely to cause confusion, to cause mistake, to deceive or otherwise mislead the trade or public into believing that plaintiff or any authorized user of the BIOPURE Mark and defendants are one and the same or are in some way connected or that plaintiff is a sponsor of defendants or that the goods or services of defendants originate with plaintiff or any authorized user of the BIOPURE Mark or are likely to lead the trade or public to associate defendants with plaintiff.

The parties are also ORDERED to meet and confer to discuss the appropriate bond, and if they agree, shall submit a stipulation within fourteen (14) days of Judge Lasnik's Order. If the parties are unable to agree on the amount of the bond, they shall provide the Court with separate submissions explaining their positions by no later than fourteen (14) days of Judge Lasnik's Order.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **July 21, 2017**. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no

1 | timely objections are filed, the matter will be ready for consideration by the District Judge on

2 | **July 28, 2017**.

3 |       This Report and Recommendation is not an appealable order.  Thus, a notice of appeal

4 | seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

5 | assigned District Judge acts on this Report and Recommendation.

6 |       The Clerk is directed to send copies of this Report and Recommendation to the parties

7 | and to Judge Lasnik.

8 |       Dated this _____ day of July, 2017.

9

10 |                               JAMES P. DONOHUE
                              Chief United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23