UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BIOPURE HEALING PRODUCTS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>WELLNX LIFE SCIENCES, INC. and PLATINUM US DISTRIBUTION, INC. d/b/a WELLNX LIFE SCIENCES, USA,<br><br>Defendants. | NO. C17-470-RSL<br><br><br><br>ORDER DIRECTING PLAINTIFF TO POST A $75,000 SECURITY BOND WITH THE COURT |

I. INTRODUCTION

This matter comes before the Court upon the parties' numerous submissions regarding an appropriate injunction bond amount under Fed. R. Civ. P. 65(c). Dkts. 60-66, 69-70.[1] On August 24, 2017, the Honorable Robert S. Lasnik granted plaintiff's motion for preliminary injunction, which becomes effective on September 23, 2017. Dkt. 58. To date, the parties have been unable to reach an agreement as to the appropriate bond amount in this case. Having reviewed the parties' briefs and supporting materials, the governing law, and the

---

[1] The parties were previously directed by the Court to either submit a stipulation as to the amount of the bond, or if they are unable to agree, submit separate submissions explaining their respective positions. Dkt. 49 at 29.

ORDER - 1

balance of the record, the Court exercises its discretion under Rule 65(c) to set a bond in the amount of $75,000.

## II. DISCUSSION

A. <u>Legal Standard</u>

Federal Rule of Civil Procedure 65(c) provides that this "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined for restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has recognized that Rule 65(c) "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotations omitted). The district court may therefore "dispense with the filing of a bond when it concludes that there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

The burden of providing that a bond is needed is on the party requesting the bond. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). The moving party's size and financial resources may also be considered in setting a reduced bond amount. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000) (district court did not abuse discretion by requiring a $25,000 bond and defendants request to significantly raise that amount "would risk denying [the plaintiff] access to judicial review since the preliminary injunction would not take effect until [the plaintiff] posted the bond."); *Color Me House, Inc. v. Discovery Commc'ns, Inc.*, Case No. C12-5935-RJB, 2013 WL 1283806, *10 (March 27, 2013) (holding that a $1,000 minimal bond is all that is required because plaintiff "has shown a strong likelihood of success on the merits, it is a small business, and it does not have the resources to purchase a large bond.").

B. Parties' Contentions

Defendants ask the Court to require BioPure to post a bond in the amount of $474,400. Dkt. 60. Defendants argue that the evidence they have provided from third-party data (along with defendants' own price lists) demonstrate that $474,400 is the "actual, out-of-pocket costs" that defendants will incur in order to comply with the preliminary injunction issued by the Court. Dkt. 65 at 2. WellNX estimates its costs of complying with the preliminary injunction as follows: (1) costs of existing bottles, labels, and packages bearing the name "BioPure" that must be destroyed ($86,000); (2) costs of new bottles, labels and packages that do not bear the name "BioPure" ($86,000); (3) labor costs to un-package and repackage the inventory ($182,000); (4) third-party vendor overage charges ($70,400); and (5) costs of excess labels, bottles, and packaging (*i.e.* inventory) bearing the name "BioPure" that were to be used to package and label products, but now must be destroyed ($50,000). Dkt. 60 at 3.

Specifically, WellNX asserts that it needs to repackage approximately 200,000 units of products bearing the "BioPure" name on the bottle, label, or packaging, which will require buying new bottles, new labels, and new boxes for a total of $86,000. Dkt. 61 (First Johnson Decl.) at ¶¶ 3-4.[2] WellNX asserts that because it will not only need to purchase new packaging but destroy the old packaging, which it had already purchased at $0.43 per unit, the loss of that old packaging is an additional $86,000. *Id*. *See also* Dkt. 61, Ex A (WellNX's price sheet, reflecting the bottle, label, and box costs). Thus, defendants assert that the "hard costs" of repacking, before labor, equal $172,000. WellNX will utilize its third party fulfillment center Dynamics, Inc. for the labor of the repacking effort, at a cost of $0.91 per unit, for a total of

---

[2] WellNX's actual cost for the bottles is $0.185 per bottle, $.035 for labels, and $0.21 for boxes. Thus, WellNX asserts that the hard costs of the new packaging will cost $0.43 per unit, or a total of $86,000. *Id*. at ¶ 4.

ORDER - 3

$182,000 in labor costs. Dkt. 61 (First Johnson Decl.) at ¶ 5. *See also* Dkt. 61, Ex. B (Dynamics' estimate of labor costs, totaling $0.91 per unit). In addition, WellNX asserts that "third party vendors typically estimate a potential overage charge equaling 20% of the total cost," which defendants assert is $70,400. Finally, WellNX has approximately $50,000 of packaging inventory on hand that now must be destroyed. In total, WellNX estimates its out-of-pocket expenses associated with complying with the injunction to be $474,400 ($86,000 + $86,000 + $182,000 + $70,400 + $50,000), and seeks a bond in that amount. Dkt. 61 (First Johnson Decl.) at ¶ 8.

By contrast, BioPure contends that a $45,000 bond sufficiently protects defendants' interests, and more appropriately takes into account the small size and limited financial resources of BioPure. Dkt. 62 at 12. Specifically, BioPure explains that despite the Court's Order that the parties meet and confer to discuss an appropriate bond amount, prior to filing their separate submission with the Court, defendants never provided plaintiff with any documentation supporting their requested figures, which initially totaled $850,000 during the parties' meet and confer telephone conference on August 29, 2017. Dkt. 64 (Levy Decl.) at ¶¶ 5-7. Although defendants significantly reduced their requested bond by the time of the parties' second meet and confer telephone conference on September 7, 2017, defendants never provided BioPure with documentation to support either of their proposed bond amounts. Dkt. 62 at 5. *See also* Dkt. 64 (Levy Decl.) at ¶¶ 16-20. Thus, BioPure contends that defendants' conduct during their two meet and confer telephone conferences prevented the parties from making any real progress towards reaching an agreement on the bond amount.

With respect to WellNX's $474,400 bond request, BioPure argues that WellNX has greatly inflated its estimated costs to prevent BioPure from receiving the benefit of the injunctive relief the Court has ordered. For example, BioPure contends that defendants' unit

costs for packaging have been improperly doubled to account for new, non-infringing packaging, as well as the costs of destroying existing packaging. BioPure points out that WellNX would have to pay for one set of packaging regardless of the injunction, and the cost of complying with the injunction should therefore only include the *additional* repackaging costs. *Id.* at 7. Similarly, BioPure contends that "the alleged $50,000 cost for excess labels in Wellnx's inventory is not damage caused by the injunction because the injunction does not require destruction of the labels. They can be stored and used later if the preliminary injunction were reversed on appeal." Dkt. 69 at 2. In addition, BioPure asserts that WellNX's vague and speculative $70,400 charge for "potential" penalties charged by retailers for late shipments should be disregarded, as WellNX has been on notice since the July 6, 2017 date of the Report and Recommendation that it would need to alter its packaging to meet its shipment commitments and provides no evidence supporting this "potential overage charge." Dkt. 69 at 5; Dkt. 63 (Annicchiarico Decl.) at ¶¶ 20-22.

Finally, BioPure points out that WellNX's estimate for both the hard costs and labor required to repack its 200,000 units of inventory was based only on defendants' Slimquick Pure pills, which require a carton, bottle, and a label (and are therefore the most expensive to repack) when there are actually three different types of enjoined products with different packaging needs. Dkt. 69 at 6.[3] BioPure's CEO Mr. Annicchiarico, relying on his own experience and the material costs provided by WellNX, estimates that it would cost only

---

[3] With respect to the pills, BioPure argues that WellNX's estimated labor charge of $0.91 per unit is an "absurdly high figure" that is "more than twenty times the going rate for this type of work." Dkt. 62 at 11. BioPure contends that WellNX was only required by the preliminary injunction to place new labels over the top of the existing labels, and therefore the "material costs for a new bottle and new cap are not required to comply with the injunction. The bottles themselves do not display the BIOPURE name, only the labels placed on them." Dkt. 62 at 11.

ORDER - 5

$45,000 ($33,000 for materials and $12,000 for labor) for several temporary employees to repackage the enjoined products by simply placing new labels over the old labels. Dkt. 63 (Annicchiarico Decl.) at ¶¶ 18-20. Alternatively, if new bottles and caps must be used, BioPure contends that "it would surely be less expensive to limit the manual labor to the emptying of the packages," and "once the product was removed, Wellnx could use its existing automated processes to package and label the product." Dkt. 69 at 7. Again, Mr. Annicchiarico estimates that the cost of such labor would equal no more than $12,000. Dkt. 70 (Second Annicchiarico Decl.) at ¶ 70.

Defendants respond that Mr. Annicchiarico is merely speculating, as he has no experience in the repacking of consumer products to be distributed in mass retail outlets and he does not cite to any third-party data to support his conclusions. Dkt. 65 at 3-4. Defendants assert that Mr. Annicchiarico's suggestions for repacking the products less expensively (such as simply placing a new sticker over the old sticker that contained the word "BioPure") are not workable for a variety of reasons and would negatively impact defendants' brand and its relationship with its retail partners and consumers. *Id.* For example, Dana Johnson, President of WellNX Life Sciences, Inc., asserts that in the past "WellNX has done a repack by simply placing a new sticker over the old sticker. When we did that, we experienced significant consumer backlash, with consumers complaining, among other things, that the product appeared to be 'tampered with' and that the product was different than that reflected in the new label." Dkt. 66 (Second Johnson Decl.) at ¶ 5. Ms. Johnson asserts that the "the result was a significant decline in sales, as well as harm to the perception of our product with the consumers and our mass retail partners. As a result, other repacks that we have done since that time have all followed the same procedure as we are going here – new bottles, new labels and new boxes, all re-packed by a third party professional organization." *Id*. Defendants further

contend that they have worked with these same professional companies before and "it is industry standard that such repacks are done by professional, third party companies, in professional FDA-approved facilities, especially since these are products that are sold in mass retail outlets throughout the country." *Id.* at ¶ 6.[4]

### C. The Court Finds that a $75,000 Bond is Sufficient in this Case

As a threshold matter, the Court observes that although WellNX technically complied with the Court's meet and confer requirement by participating in two telephone conferences with counsel for BioPure, WellNX's failure to submit any documentation in support of its bond estimates to BioPure prevented the parties from reaching an agreement. *See* Dkt. 64 (Levy Decl.) at ¶¶ 5-7, 16-20. Based upon WellNX's submissions to the Court in support of its current bond request of $474,400, it is difficult to fathom how WellNX's initial $850,000 estimate could have had any basis in fact and have been made in good faith. As discussed below, given the dearth of documentation submitted to the Court by WellNX to support its current request for a $474,400 bond, the Court finds that a $75,000 bond is sufficient in this case.

Costs for defendants' existing bottles, labels, and packages that bear the BioPure name, and therefore can no longer be used by WellNX following September 23, 2017, are appropriately included in the bond estimate. As noted above, however, the documentation provided by WellNX is insufficient for the Court to substantiate the $86,000 amount sought by WellNX for this existing packaging. *See* Dkt. 61, Exs. A-B. As BioPure points out, WellNX's packaging needs differ product by product, and only one of the three products bearing the

---

[4] Defendants assert that the $0.91 labor costs are not exorbitant and are consistent with the work to be performed on this significant repack, and consistent with the charges that WellNX has paid in prior repacks. *Id.* at ¶ 7. Defendants further assert that the cost to produce the fully furnished product are significantly greater than $0.91 per unit. *Id.*

ORDER - 7

"BioPure" name will require replacement of a bottle, label, and carton.[5] WellNX's $86,000 estimate presumes that all 200,000 units require all this packaging, when this is not the case. *See* Dkt. 63 (Annicchiarico Decl.) at ¶¶ 12-16. Although WellNX concedes that the three products in its inventory requiring repacking include "132,851 units pills/powder, 53,401 of Mixed Berries, and, 16,290 Gummies," WellNX does not provide an explanation of its actual packaging needs for each of these products. *See* Dkt. 66 (Second Johnson Decl.) at ¶ 9.[6] The Court finds that WellNX's $86,000 amount significantly overestimates the costs of the existing bottles, labels, and packages bearing the name "BioPure."

Similarly, just as WellNX has not adequately explained what packaging is needed to repack the three distinct products at issue, the Court cannot determine from WellNX's submissions what labor is actually needed to complete the repack of all three products. WellNX's estimate from Dynamics, Inc. for $0.91 per unit only pertains to a product that requires a new bottle, label, and carton. Dkt. 61, Ex. 2. However, WellNX does not dispute BioPure's evidence that all of these steps will not be required to repack all three products. Dkt. 63 (Annicchiarico Decl.) at ¶¶ 12-16. For example, the powder drink mix will only require a new paper carton, as the word "BioPure" does not appear on the individual powder packets. Dkt. 63 (Annicchiarico Decl.) at ¶¶ 14-15. As a result, WellNX's $182,000 estimate for labor (200,000 units times $.091 per unit = $182,000) is inaccurate. As discussed above, WellNX has the burden of establishing what costs would be incurred by the company in complying with

---

[5] Although the parties disagree regarding whether a new bottle is necessary to repack the supplements and gummies, the Court finds that WellNX has provided sufficient evidence to explain why a new bottle is needed.

[6] WellNX's reference to "53,401 Mixed Berries" may refer to the mixed berries flavored drink mix, which would only require a new paper carton and no new bottle or other label. Dkt. 63 (Annicchiarico Decl.) at ¶ 14. However, this powdered drink mix, which would require minimal packaging and labor, may also be included in WellNX's estimated "132,851 units pills/powder."

ORDER - 8

the preliminary injunction in this case. Based upon the evidence submitted by both parties, the Court finds that $75,000 is a reasonable estimate to encompass both the costs of the existing bottles, labels, and packages bearing the name "BioPure" and the labor needed to complete the repack of these products.

The Court exercises its discretion not to include the additional sums requested by defendants in the bond amount, such as the costs of excess labels, bottles, and packaging (*i.e.* inventory) bearing the BioPure name that were intended to be used to package and label defendants' products in the future. As noted above, WellNX received notice of the preliminary injunction over two months ago on the date of the July 6, 2017 Report and Recommendation, which specifically stated that the injunction would "take effect thirty (30) days" after Judge Lasnik's adoption of the R&R "in order to provide defendant with sufficient time to alter its packaging." Dkt. 49 at 28. However, WellNX has not described *any* effort on its part to either liquidate or use up its non-conforming inventory prior to September 23, 2017. The Court has provided WellNX with ample time to implement measures to minimize the costs and expenses associated with compliance, including using up existing inventory. As far as the Court is aware, based on WellNX's own submissions to the Court, no such efforts were made.[7] As a result, the $50,000 of excess packaging inventory shall not be included the bond estimate.

With respect to WellNX's request for an additional $86,000 to cover the expense of new bottles, labels and packages that comply with the injunction, the Court agrees with BioPure that the cost of new packaging would have been incurred in the ordinary course of WellNX's business to sell its products. If the cost of the existing packaging and new

---

[7] If substantial efforts have been made by WellNX to reduce costs and prepare for the September 23, 2017 deadline, WellNX chose not to describe them to the Court and instead, to seek a high bond amount.

ORDER - 9

packaging for the 200,000 units were both included in the bond estimate, it would amount to double-recovery for WellNX. In addition, WellNX has provided no evidence that it will be charged third-party vendor overage charges ($70,400). Without more, Ms. Johnson's statement that "in any major relabeling/repackaging situation . . . third party vendors typically estimate a potential overage charge equalizing 20% of the total cost" does not establish that WellNX will actually incur any such charges in this case, particularly if WellNX took reasonable steps during the last two months to prepare for the repack. Dkt. 61 (Johnson Decl.) at ¶ 6. Accordingly, the costs of new packaging and the speculative third-party vendor overage charges are not included in the bond.

Finally, the Court notes that both parties in this case have expressed concerns regarding the high costs of this litigation, and the limited financial resources of their relatively small companies. *See* Dkt. 62 at 12 ("BioPure is a small closely held company with limited financial resources. A very large bond amount . . . may prevent BioPure from being able to receive the relief that the Court has ordered."); Dkt. 66 (Second Johnson Decl.) at ¶ 3 ("[T]he costs of properly complying with the preliminary injunction . . . will take a significantly financial toll on Wellnx" and "will likely result in the reduction of at least 1 of our 15 employees, and put the company on the verge of insolvency."). The primary issue driving this case has been decided, at least preliminarily. The parties should be able to reach a resolution at this stage, if they are serious about reducing the impact of litigation costs on their operations. Accordingly, the Court directs the parties to meet and confer within two weeks from the date of this Order regarding the possibility of early mediation, and promptly advise the Court as to the outcome of those discussions.

### III. CONCLUSION

For the reasons discussed above, the Court directs the plaintiff to post a bond in the amount of $75,000 to pay the costs and damages sustained by defendants, if they are later found to have been wrongfully enjoined. BioPure shall secure and register the bond with the Court within two weeks of the date of this Order. The Clerk is directed to send a copy of this Order to counsel for both parties and to Judge Lasnik.

DATED this 20th day of September, 2017.

*James P. Donohue*

JAMES P. DONOHUE
Chief United States Magistrate Judge